UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case Number:  07-80263-CIV-MARRA/JOHNSON

FICUS FARM, INC., a Florida
corporation

    Petitioner

v.

UNITED STATES DEPARTMENT
OF AGRICULTURE - RISK MANAGEMENT
AGENCY, FEDERAL CROP INSURANCE
CORPORATION,

    Respondent.
_____/

**ORDER AND OPINION DENYING PETITIONER'S MOTION FOR SUMMARY JUDGMENT AND GRANTING RESPONDENT'S CROSS MOTION FOR SUMMARY JUDGMENT**

**THIS CAUSE** is before the Court upon Petitioner's Motion For Summary Judgment [DE 16] and Respondent's Cross Motion for Summary Judgment [DE 30]. The Court has carefully considered the motion, response, reply, sur-reply, the entire case record, and oral argument of counsel.

## INTRODUCTION

Ficus Farm, Inc. ("Ficus Farm" or "Petitioner") filed an appeal challenging a United States Department of Agriculture - Risk Management Agency ("RMA") decision dated May 15, 2006.  *See* CR 928-36.[1]  RMA participated in adjusting Petitioner's insurance claim for nursery losses.  RMA and the Petitioner's insurer, Rain and Hail

---

[1] All cites are to the Case Record ("CR") as filed with the District Court.

("Insurer"), decided not to indemnify Petitioner for part of its losses.

After a three day hearing below, the Hearing Officer, National Appeals Division, determined that Ficus Farm had not proven, by a preponderance of the evidence, that a portion of its claim under a crop insurance policy had been wrongfully denied by Insurer. The Hearing Officer's decision was upheld by the Director's Determination, which is a final determination of the Risk Management Agency.[2]

## UNDISPUTED FACTS

Ficus Farm is a nursery comprised of about 140 acres of land located in Loxahatchee, Florida. On September 27, 2004, Ficus Farm's owner, Raza Kalantari ("Kalantari") filed an application for crop insurance for his 2005 field-grown and container-grown nursery crops. CR 970-73. To stock its field-grown nursery, Ficus Farm bought royal palm trees ("palms") in October 2004 from a nursery (Westwind) that had been hit by two major hurricanes (Frances and Jeanne) in 2004. The palms Ficus Farm bought were the damaged inventory of the seller for which the seller had filed an insurance claim. The seller's insurance company deemed the palms to be damaged and of no value. The seller's insurer paid for the loss of the palms. CR 953-

---

[2] In bringing its complaint, Ficus Farm has premised jurisdiction on 7 U.S.C.A. § 6999, which provides that a final determination by the National Appeals Division of the United States Department of Agriculture ("USDA") "shall be reviewable and enforceable by any United States district court of competent jurisdiction in accordance with chapter 7 of Title 5." 7 U. S .C.A. § 6999. Section 6999 thus gives the Court jurisdiction to review the final determination of the RMA.

54, 1113-17.  After receiving payment for the damaged palms, the seller cleaned its nursery, straightened the palms, trimmed some fronds, and sold the palms to Ficus Farm.  CR 396-420.

In January 2005, Insurer sent an adjuster to conduct a pre-acceptance inspection of Ficus Farm's nursery.  CR 636.  The adjuster, Leon Libbert ("Libbert"), observed that the fronds on the palms were brown and split as if they had been wind whipped.  CR 637-39, 982.  Libbert questioned Kalantari about the condition of the royal palms.  Kalantari explained that the condition was typical of young replanted palms.  Subsequently, Libbert called an expert on palms and discussed the appearance of these plants.  The expert told Libbert that a wind-whipped appearance is normal in recently transplanted palms.  Libbert relayed his findings to Insurer and Insurer provided insurance coverage for Ficus Farm's 2005 field-grown and container-grown plants.  CR 982.

On June 1, 2005, Ficus Farm notified Insurer of losses caused by excessive moisture.  On June 14, 2005, Insurer sent the same adjuster that had first inspected Ficus Farm's plants, Libbert, to adjust the loss.  Libbert found 200 to 300 dead palms and the majority of Ficus Farm's inventory with leaf spot fungus.  CR 640-44, 1099.  Libbert and Kalantari collected one Areca Palm sample and two Royal Palm samples to be laboratory tested.  CR 645-47, 1099.  On June 20, 2005, a plant pathologist, R.T. McMillian, Jr., found all three palms infected with the same fungus, Drechslera.  The pathologist reported that "[t]he palms were also showing typical nutritional

deficiency symptoms of magnesium and zinc which cause plant stress and can be a factor in the disease.  However, the recent rains that have occurred in south Florida would be a greater factor in predisposing these palms to the fungus, Drechslera." CR 1031.  The plant pathologist recommended discontinuation of overhead irrigation, removal of the severely diseased plants, and application of specific nutrients and fertilizer.  *Id*.

On June 27, Kalantari called Libbert and reported that his plants were worse and he wanted to start destroying plants.  CR 1099.  Libbert read the plant pathologist's report to Kalantari over the telephone.  The parties dispute what plants Libbert orally agreed Kalantari could remove or destroy.  Libbert claims he told Kalantari that Kalantari could remove the dead royal palms (approximately 200-300) from his field but that Libbert needed further information before consenting to the destruction of any Areca Palms.  Libbert further claims that he told Kalantari he could not destroy any other plants until they discussed the situation during the next visit on June 30, 2005.  CR 650-51.  Kalantari, on the other hand, claims that Libbert gave him permission to remove all the "bad plants."  CR 445.  Kalantari requested written confirmation of the adjuster's instructions, which the adjuster supplied.  CR 651, 1022.  The letter, dated June 27, 2005, reads "[i]n keeping with our telephone conversation, please be advised that you are not to remove or destroy any plants from your inventory until we have received all lab reports.  I will give you written authorization when you may remove affected plants."  CR 1022.

On June 30, 2005, Libbert returned to the nursery. Libbert found that Ficus Farm had destroyed 10,391 royal palms, 9,159 Boston ferns and 1,707 Kimberley Queen Sword ferns. CR 993, 1099. In addition to the loss of palms and ferns, Ficus Farm reported the loss of 220 Jessamine and 1,488 Variegated Ginger plants. CR 993.

In accordance with the insurance policy, Ficus Farm was instructed to produce invoices for the royal palms it had purchased. Insurer repeatedly requested copies of the invoices in July and August, 2005. CR 661-62, 803-05, 1126-27. On September 1, 2005, Ficus Farm sent the Insurer cancelled checks in lieu of invoices. The cancelled checks revealed the source of the palms. After receiving this information, Insurer learned that the palms were the damaged inventory for which an indemnity had already been paid in 2004. CR 1127.

Insurer reduced the "field inventory value" of Ficus Farm's nursery due to its determination that Kalantari had not reported previous or existing damage of the crops at the time of application. CR 1121. Because the Federal Crop Insurance Corporation ("FCIC") had reinsured the policy and was at risk for payment, the United States Department of Agriculture, Risk Management Agency, Federal Crop Insurance Corporation ("RMA") elected to review Ficus Farm's claim under its large claim procedure. RMA denied the claim in part and provided Ficus Farm notice of its right to appeal to the National Appeals Division ("NAD").

The Hearing Officer for the NAD issued his decision on November 6, 2006, after hearing extensive testimony of the witnesses, including Kalantari. The Hearing

Officer determined that Ficus Farm had not carried its burden of proof in showing that Insurer's partial denial of Ficus Farm's insurance claim was incorrect. Specifically, the Hearing Officer determined that Ficus Farm, through its owner Kalantari: (1) had misrepresented material facts to Insurer during the underwriting report process for the purpose of securing an increase in the value of the policy for crop year 2005 in violation of Section 27 of the policy; (2) had destroyed certain crops without permission of Insurer in violation of the policy; and (3) failed to mitigate its losses. CR 856-61. The Hearing Officer advised Ficus Farm of its appeal rights for Director Review. CR 863. Ficus Farm filed a Notice of Request For Director Review on November 22, 2006. CR 867. The Director Review Determination was also adverse to Ficus Farm. CR 900. The Director upheld the decision of the NAD Hearing Officer, which is administratively final. 7 U.S.C. § 6998(b). Ficus Farm, having exhausted its administrative remedies, filed this lawsuit.

## STANDARD OF REVIEW UNDER THE ADMINISTRATIVE PROCEDURE ACT

The standard for review of Petitioner's Motion is that set forth in the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-06. The APA states that an agency's decision, including its actions, findings and conclusions, should not be overturned unless it is unsupported by substantial evidence, or if it is arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2). This is not a *de novo* proceeding but, rather, is to be conducted as a "record review."

In the context of the APA, substantial evidence review is conducted on the record considered as a whole, taking into account contradictory evidence in the record.  *See Universal Camera Corp. v. N.L.R.B.*, 340 U.S. 474, 487-88 (1951); *see also Greater Orlando Aviation Auth. v. F.A.A.*, 939 F.2d 954, 958 (11th Cir. 1991); *Fields v. U.S. Dept. of Labor Administrative Review Bd.*, 173 F.3d 811, 814 (11th Cir. 1999) ("The reviewing court does not reweigh the evidence or substitute its judgment for that of the ARB, but reviews the entire record to determine if the decision reached is reasonable and supported by substantial evidence").

Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Universal Camera,* 340 U.S. at 477 (internal quotation marks omitted), *quoted in American Textile Mfrs. Inst. v. Donovan*, 452 U.S. 490, 522 (1981); *see also F.T.C. v. Indiana Fed'n of Dentists*, 476 U.S. 447, 454 (1986).  But "the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *American Textile*, 452 U.S. at 523 (internal quotation marks omitted).

> The scope of review under the 'arbitrary and capricious' standard is narrow and a court is not to substitute its judgment for that of the agency.  Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.' ...  In reviewing that explanation, we must 'consider whether the decision was based on a consideration of the relevant factors and whether there

>has been a clear error of judgment.' ...  Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  The reviewing court should not attempt itself to make up for such deficiencies; we may not supply a reasoned basis for the agency's action that the agency itself has not given.

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal cited and quoted sources omitted).

Section 11.8(e) of Title 7 of the Code of Federal Regulations specifies the burden of proof that the appellant must meet when seeking to have an adverse agency determination reversed by the National Appeals Division.  *See* 7 C.F.R. §§ 11.1 through 11.8 (2007).  Specifically, under the subsection titled "Division hearings," the regulations state, "[t]he appellant has the burden of proving that the adverse decision of the agency was erroneous by a preponderance of the evidence."  7 C.F.R. § 11.8(e) (2007).  As the Petitioner in this action for judicial review, Ficus Farms has the burden of persuading the Court that the adverse decision of the Risk Management Agency, as upheld by the National Appeals Division Hearing Officer and Deputy Director, was erroneous by a preponderance of the evidence.

The issue before the Court is whether there is substantial evidence in the record to support the Director's Determination.  Petitioner asserts that the Findings of Fact made by the Hearing Officer and affirmed by the Deputy Director were not

founded on substantial evidence.  "Specifically, the record clearly shows that the Risk Management Agency jumped to conclusions without first objectively reviewing the facts involving the insurer's (Rain and Hail)'s manipulation and misrepresentation of the facts concerning alleged representations made by Ficus to them."  DE 23 at 2.  RMA asserts that Petitioner has not met its burden and therefore it is entitled to no relief.

**DISCUSSION**

**Misrepresentation**

The Deputy Director found that

> Appellant misrepresented the condition of the Royal Palms by failing to disclose that the palms had a leaf fungus.  Moreover, Appellant misrepresented the fact that it purchased all of its Royal Palms from Seller, whose nursery in Martin County was directly affected by two hurricanes in 2004, at a significantly reduced price and about two months after the hurricanes.  Instead, Appellant told Insurer it purchased its Royal Palms from various suppliers in Homestead, an area that was unaffected by the hurricanes and about 139 miles away from Seller's true location.  Appellant's actions constitute a deliberate effort to misrepresent the provenance of its Royal Palms, thereby depriving Insurer from making an informed decision as to their value and insurability.

CR 908.  Regarding misrepresentation, the Hearing Officer and Deputy Director focused primarily on whether Kalantari intentionally concealed from the insurance adjusters the "point of purchase" of the plants.  For the findings made in the above quoted paragraph, the Deputy Director cited to Findings of Fact 5 (made by the

Hearing Officer, NAD (*see* CR 857)) which cites to AR 3 and 56, and transcript pages 554-557.  These pages constitute:

(a) A page from the FCIC's final determination on Ficus Farm' original insurance claim.  The document states, without any citation to the record, that "[o]n January 13, 2005, the Company sent a loss adjustment contractor, Leon Libbert, to conduct the inspection.  Libbert questioned the condition of the palm trees and asked where they were obtained.  According to his statement and his notes taken at the time, you stated that you obtained the palms from the Homestead area and that palms sometimes look bad when they are first set out but that they would recover in a short time."  AR 3 or CR 929.

(b) Libbert's Special Report, dated January 23, 2005, which makes no mention of any discussion regarding the source of the plants but mentions that the fronds on the palms were brown and split.  "I contacted the Lake County Agriculture Extension to discuss this condition.  They informed me that the Insured was correct, and that this is characteristic of many palms."  AR 56 or CR 982.

(c) Libbert's testimony that Kalantari said that he acquired the plants from Homestead:

> Q: When you were questioning the condition of those trees on January the 23rd during the pre-acceptance, did you specifically ask Mr. Kalantari where those trees came from?
>
> A: Yes, I did.  I asked him where he was getting his trees.  And he told me they was coming from the Homestead area.  And I asked him who he was getting them from.  And he said well, since I'm getting so many – I'm

>   getting over 30,000 of them – that I don't have any single supplier that can supply them.  That I'm getting them from several different nurseries.

Transcript pages 554-557 or CR 638-641.

Also, in the record, another adjuster, Jeff Lanier, wrote in a report drafted on April 3, 2006, that on August 10, 2005, Kalantari "specially stated 'all the plants came from down south.'  I assumed he was referring to Homestead, FL."  CR 1501.

The evidence to the contrary is Kalantari's own hearing testimony where he denies ever being asked by the adjusters the place of the plant's purchase.  Ficus Farm points out that Libbert's report, prepared closest in time to the underwriting inspection, discusses the wind whipped condition of the palms, but makes no reference to the point of purchase of the plants.  CR 979-982.  The Hearing Officer also found this fact curious and put the following questions to Libbert:

>   Q:   If the place of purchase is such a critical factor in determining whether the plants qualify for insurance – why is it that there was no reference to that critical factor in your memo on page 56 of the agency record?
>
>   A:   Page 56.  I'm on 56.  Now, what was your question again, sir?
>
>   Q:   If the place of purchase is such a critical factor in determining whether the plants could be insured, why did you make no mention of that issue in your memo as reflected on page 56 of the agency record?
>
>   A:   Well, it wasn't actually an issue at that point because when I had discussed this with Mr. Kalantari he told me they came from Orlando – Homestead area.
>
>   Q:   Why is it that you did not put that part of your discussion in this write-up that you made on page 56?

Page 11 of  19

> A: Well, again I just didn't think at that point because he told me they came from different sources in the Homestead area. And at that point, you know, I took him to be that that's where they came from.
>
> Q: Did I understand you previously to tell Mr. Martin that this page reflected all the items that you discussed with him – with Mr. Kalantari?
>
> A: Well, generally speaking, yes sir.
>
> Q: And does this – this memo of yours on page 56 provide any information or reflect any discussion about the place of purchase?
>
> A: No sir, it does not.
>
> Q: Again is that discussion that you had about the place of purchase, is that something that you would have written in the notes that you threw away?
>
> A: No.
>
> Q: That's something that you wouldn't have made a note of at all?
>
> A: No Sir.
>
> Q: Why – why is that? If – if you had knowledge that there were – had been hurricanes coming through Florida in various areas, why did that not warrant more of a notation?
>
> A: Well, I guess this – again I was taking Mr. Kalantari's information, the information that I got, that this was a normal condition possibly, and that it was not – not important at that time. Because I felt that he was telling me where they came from. And I just took his word at that.

CR 729-30.

Kalantari testified at the hearing that Libbert did not ask him the source of the plants. CR 498. Kalantari asserts that there is no evidence in the record that he misrepresented to Insurer any material matter regarding the royal palms purchased in

late 2004 and planted in early 2005.

As the Deputy Director aptly pointed out, there are conflicts in the evidence. Also, at least one report was prepared by the Insurer months after the fact.[3] It is also clear, however, that the Hearing Officer did not overlook the evidence which Ficus Farm asserts supports the conclusion that Insurer manipulated and misrepresented facts. Rather, the Hearing Officer carefully considered the credibility of the witnesses on the key issue of Kalantari's purported misrepresentation regarding the source of the plants. The Hearing Officer had the opportunity to hear each party's version of the factually disputed conversations, and determine which party's position was more credible. As the Deputy Director noted, details, such as the adjuster's initial suspicion of damage to the royal palms, leading to his inquiry of their origin, lend credibility to the adjuster's testimony. CR 907. These credibility determinations were for the Hearing Officer to make. There was sufficient evidence upon which the Hearing Officer could have relied for his conclusion, and this Court

---

[3] *See* CR 1501. Ficus Farm further argues that a fair and complete reading of the record shows that the decision rendered by the Hearing Officer and affirmed by the Deputy Director entirely failed to consider the fact that Insurer knew on January 23, 2005, that Ficus Farm purchased its royal palms from Westwind. This argument is made based on the date of a facsimile cover sheet. The cover sheet was for a fax sent by Robinson, Westwind's owner, for invoices he produced after the fact. The cover sheet is dated by hand as January 23, 2005. In response to this argument raised in the motion for summary judgment, the Respondent conventionally filed better copies of the facsimile. *See* DE 33. These pages bear the date of 9/23/05 at the top of each page as the fax date which was not discernable on the administrative record originally filed with the Court. This weight of this evidence is not substantial and this argument was not raised at the hearing. DE 23 at ¶ 9.

may not substitute its judgment for that of the Hearing Officer.  *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

**Destruction of Plants**

It is uncontroverted that Ficus Farm's policy required it to have written consent before destroying the insured plants.  When Kalantari called Libbert to inquire about the results of the laboratory tests performed on the three plants, Libbert read the report to Kalantari over the telephone.  CR 443, 649-650.  In his report, the plant pathologist Dr. McMillan characterized the fungus condition that he found as being precipitated by the rains that had preceded his examination, and that both species of plants were suffering from the fungal infection Drechslera, causing leaf spots.  CR 1031.  The report recommended, among other things, that "[t]he severely diseased plants should be removed from the nursery," and that "overhead irrigation must be stopped or drastically reduced and only applied during the dry part of the day since it will spread quickly to disease free palms."  *Id*.  During the conversation, Kalantari requested permission to begin removing plants.  Kalantari testified that Libbert gave him oral permission to begin destroying all "bad plants."  CR 527.  Libbert testified that he gave Kalantari approval to destroy only approximately 200-300 palms, the ones that were completely dead, "like broomsticks."  CR 650, 1099.

Ficus Farm was fully aware it had to have Insurer's written consent, and it requested such consent.  CR 523-25.  Libbert agreed to confirm their conversation in

writing, but the letter he wrote advised Ficus Farm "not to remove or destroy any plants."[4]  CR 1022.  Nonetheless, Kalantari went ahead and destroyed 10,391 royal palms, 9,159 Boston ferns, and 1,707 Kimberly Queen Sword ferns.  The Deputy Director affirmed the Hearing Officer's conclusion that Ficus Farm did not obtain the requisite consent before destroying these plants.  CR 908.

Ficus Farm argues that its removal of the plants was justified by either (1) being authorized by Insurer, or (2) being justified by Insurer's wrongful refusal to allow destruction of the infectious Drechslera diseased plants.  This argument misses the mark given the standard of review this Court must employ.  This Court's task is to determine whether the findings and conclusions of the Hearing Officer, as affirmed by the Deputy Director, are unsupported by substantial evidence, or if they are arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law.  *See* 5 U.S.C. § 706(2).

The fact that Ficus Farm destroyed plants without written permission is basically undisputed and supported by substantial evidence in the record.  Ficus Farm asserts that it relied on the report of the plant pathologist Dr. McMillan, discussions with experienced nurserymen, and the initial permission given by Libbert to remove what he believed to be diseased palms.  CR 443-45.  Because there is substantial evidence in the record to support the agency decision, the Court affirms the Deputy

---

[4] Substantial evidence exists in the record to support the agency's conclusion that Kalantari destroyed plant materials far in excess of what was authorized.

Directors conclusion that Ficus Farm destroyed the ferns and palms without the Insurer's written consent.  CR 860, 908.

**Jessamine and Ginger**

The Deputy Director affirmed the Hearing Officer's conclusion that Ficus Farm did not mitigate its loss by properly caring for its Jessamine and Ginger plants.  The Deputy Director stated, "Appellant allowed its Jessamine and Ginger plants to remain in standing water until the plants died.  Appellant did not try to raise the plants out of the water by putting them on boards or benches placed atop blocks.  Nor did Appellant try to move any of the plants to higher ground.  Appellant claims his nursery was in crisis, and this environment did not permit him to move the Jessamine and Ginger.  I am not persuaded by this claim." CR 909, 914.

At the hearing, Libbert testified Kalantari

> could have moved [the Jessamine and Ginger] probably 50 yards to an area just to the north that was higher land that wasn't sitting in that amount of water. . . He had plenty of space where he could move them out of the water. They were just sitting in water.  The lay of his land has got some low spots that just holds water.  There's other area that was dry.  He would not have had to have moved them very far.  Or I even suggested putting them on plaster blocks.  And he said that "the water won't hurt them."

CR 709, 711.  The plant pathologist, Robert McMillan, also testified that if a plant stands in stagnant (anaerobic) water, the water will kill the plant, no matter what kind of plant it is.  CR 333-335.

Ficus Farm argues that moving the plants 50 yards would not have made any difference and the Jessamine and Ginger would have died anyway.  Mr. Jestrovich, a licensed federal crop insurance adjuster who had formerly worked for Insurer, testified that there was no upland or dry area within the Ficus Farm nursery in which to move the Jessamine and Ginger.  In any case, according to this expert and Kalantari, under such wet conditions, moving the plants out of the standing water would not have saved them.  CR 467, 571-73.  Ficus Farm also relies upon Libbert's testimony that "we don't know [if the plants would have died anyway even if they had been moved]."  CR 712.

Because evidence was presented that supported both sides, the Court cannot conclude that the final determination of the Director of the National Appeals Division is unsupported by substantial evidence or that the determination is arbitrary and capricious.  5 U.S.C.A. § 706(2)(E).  The decision was based on a consideration of the relevant factors after having heard testimony for both sides and there is no evidence of clear error of judgment.  *Bowman Transp. v. Arkansas-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

## CONCLUSION

After review of the Case Record, this Court finds that the adverse decision of the Risk Management Agency, as upheld by the National Appeals Division Hearing Officer and Deputy Director, is supported by substantial evidence.  Furthermore, the Director's determination is neither arbitrary nor capricious.  There is sufficient

evidence in the record to support a conclusion that Ficus Farm misrepresented to Insurer the location from which Ficus Farm purchased its 2004 palms, and that this misrepresentation was material.  There is also sufficient evidence in the record to support the conclusion that Ficus Farm destroyed insured crops without consent of the Insurer in violation of the insurance policy.  Finally, there is sufficient evidence in the record to support the conclusion that Ficus Farm failed to mitigate its losses by not removing his Jessamine and Ginger plants from standing water.  Ficus Farm has failed to show by a preponderance of the evidence that the Risk Management Agency decision to adjust or reduce Petitioner's indemnity payment was erroneous.  Nothing offered by Ficus Farm persuades the Court that the Director's Determination was arbitrary, capricious, an abuse of discretion or otherwise not in accordance with law. *See* 5 U.S.C. § 706(2).   Accordingly, it is hereby

**ORDERED AND ADJUDGED** that Petitioner's Motion For Summary Judgment [DE 16] is **DENIED** and Respondent's Cross Motion for Summary Judgment [DE 30] is **GRANTED.**  In accordance with Fed.R.Civ.P. 58, final summary judgment will be entered for Respondent United States Department of Agriculture, Risk Management Agency, Federal Crop Insurance Corporation, by separate order.

**DONE AND ORDERED** in Chambers at West Palm Beach, Palm Beach County, Florida, this 27th day of August, 2008.

KENNETH A. MARRA
United States District Judge

copies to:

All counsel of record